# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DONOVAN SIMPSON,

      Petitioner,

      v.

WANZA JACKSON,

      Respondent.

                  CASE NO. 2:06-CV-127
                  JUDGE EDMUND A. SARGUS, JR.
                  MAGISTRATE JUDGE ABEL

## REPORT AND RECOMMENDATION

Petitioner Donovan Simpson, a state prisoner, brings this action for a petition for a writ of habeas corpus under 28 U.S.C. § 2254. This case arises out of Simpson's convictions for aggravated murder, murder, five counts of attempted murder, aggravated arson, and five counts of felonious assault. He maintains that his convictions violated the Constitution because the prosecution introduced statements obtained in violation of *Miranda* and the Fifth Amendment during interrogations on April 24 and 27 and June 16 and 20, 2000. This court denied the petition.[1] The United States Court of Appeals for the Sixth Circuit reversed, holding that the admission of statements Simpson made on April 24 and 27 and June 20, 2000 was contrary to and an unreasonable application of Supreme Court precedent. It concluded that petitioner was entitled to the issuance of a writ of habeas corpus as to his convictions for aggravated murder, murder, and attempted murder, but affirmed the denial of the petition as to his convictions for aggravated arson and felonious assault. *Simpson v. Jackson*, 615 F.3d 421, 423, 439, 441-42, 444-45 (6th Cir. 2010). The United States Supreme Court granted Simpson's petition for writ of certiorari,

---

[1] In addition to the confession claims, the petition also alleged that petitioner was denied a fair trial by the trial judge's evidentiary rulings; he was denied his right to confront witnesses against him; the evidence was constitutionally insufficient; he was denied the effective assistance of counsel; the trial judge improperly failed to conduct an inquiry into his attorney's alleged conflict of interest, and the trial judge gave improper jury instructions, and that his arrest warrant was invalid.

vacated judgment, and remanded to the Court of Appeals for further consideration in light of

*Howes v. Fields*, 132 S.Ct. 1181, 565 U.S. ___ (2012). This matter is now before the district court

on remand from the United States Court of Appeals for the Sixth Circuit. *Donovan v. Wanza*

*Jackson, Warden and Michael Sheets, Warden,* No. 08-3224 (6th Cir. June 28, 2013) See, Doc.

65.

      For the reasons that follow, the Magistrate Judge concludes that *Howes* does not alter the

outcome of this case and therefore **RECOMMENDS t**hat the petition for a writ of habeas corpus

be **GRANTED** as to petitioner Simpson's convictions for aggravated murder, murder, and

attempted murder, and that these convictions be **VACATED** subject to the State of Ohio com-

mencing a re-trial on these charges within 90 days.  The Magistrate Judge further **RECOM-**

**MENDS** that the petition be **DENIED** as to petitioner Simpson's convictions for aggravated

arson and five counts of felonious assault and that he be required to serve the remainder of his

sentences on those charges.

      **FACTS UNDERLYING CRIMINAL CONVICTIONS:**

      The Ohio Tenth District Court of Appeals's July 30, 2002decision affirming Simpson's

convictions summarized the facts and procedural history of this case as follows:

>       In the early morning hours of October 27, 1997, a fire broke out at
> 151 South Wheatland Avenue in Columbus, Ohio. At the time, Aleta Bell
> and three of her four children, Shenequa, age five, Elijah, age three, and
> Myesha, five-months old, were asleep in the house. Also sleeping in the
> house were two men, Terrance Hall and Gary Williams, Myesha's father.
> Hall was awakened early that morning by a loud crash of glass. He found
> the house engulfed in flames. After running out of the house, Hall was
> able to wake Aleta Bell and Williams, who were sleeping with Myesha in
> the same room. They were able to get out of the house. Unfortunately,
> they were not able to reach the two children who were sleeping in a back
> bed-room. Members of the Columbus Fire Department ("CFD") arrived on
> the scene and were able to find the two children and take them directly to
> Children's Hospital. However, as a result of the injuries sustained in the
> fire, Shenequa Bell died days later. Elijah Bell survived, but suffered

2

serious injuries.

By indictment filed August 24, 2000, appellant was charged with thirteen counts relating to the fire at 151 South Wheatland Avenue. Appellant was charged with two counts of aggravated murder for the death of Shenequa Bell, in violation of R.C. 2903.01. Both counts contained death penalty specifications pursuant to R.C. 2929.04(A). Appellant was also charged with five counts of attempted murder of the five other people in the house, in violation of R.C. 2923.02 and 2903.02; one count of aggravated arson, in violation of R.C. 2909.02; and five counts of felonious assault, in violation of R.C. 2903.11. Appellant entered a not guilty plea to all of the charges and proceeded to a jury trial.

Before his trial, appellant sought to suppress four verbal statements he made to police officers prior to being indicted. Two of these statements, one on April 24 and another on April 27, 2000, were made to officers while appellant was incarcerated in the Licking Southeastern Correctional Institution for an unrelated crime. Both of these statements were recorded. No *Miranda* warnings were given to appellant before he made these statements. The other two statements, one on June 16 and one on June 20, 2000, were made at Columbus Police Headquarters. Both of these statements (which were essentially confessions) were videotaped. Appellant was read his *Miranda* rights before these statements were made and he signed a form indicating he understood and waived those rights. After an evidentiary hearing, the trial court denied his motion thereby permitting the state to introduce these statements into evidence at trial.

The following key testimony was presented during the state's case. CFD Battalion Chief Tom Hackett was the first fire fighter to arrive at the scene of the fire. He testified that, when he arrived, there was a male and a female with a small infant on the front roof of the house. He stated that, when water from the fire hoses hit the fire, the fire flashed back, which was not typical. Hackett testified that a fire flashback under these circumstances was consistent with the presence of a flammable liquid. It was his impression from the size of this fire and the time it took to extinguish it that the fire was intentionally set.

After the fire was extinguished, Kenyon Beavers, a dog handler for the CFD, testified that he went to the scene with his dog to search through the first floor of the house for traces of flammable liquids. Beavers and the dog walked through the first floor from the back to the front of the house. In the front of the house, in the living room right inside a large window, the dog gave a "primary alert" (i.e., an indication that the dog detected the presence of a flammable liquid). After searching the rest of the room, Beavers took the dog outside, where the dog gave another "primary alert,"

3

this time on the porch directly outside the large window in the living room. On cross-examination, Beavers admitted that surface samples taken from the areas where his dog had indicated the primary alerts did not show the presence of an accelerant when tested.

Billy Reedus, a CFD investigator who investigated the fire, testified that he arrived at the scene after the fire was extinguished. Upon arrival, it was obvious to him that the fire damage was centered in the living room and that the fire's point of origin was in that room. Specifically, he testified that the fire started in the area below the large window in the living room. He also saw a pattern of fire damage in the house that was consistent with the presence of some sort of accelerant at the origin of the fire. He then eliminated likely accidental causes of a fire, such as electrical, weather and cigarettes, to arrive at his conclusion that the fire was intentionally set. He further concluded that the fire had been set by a Molotov cocktail that was thrown through the large window in the living room. Reedus testified that a Molotov cocktail consists of a glass bottle filled with a flammable liquid, such as gasoline or alcohol. A wick of some sort is then placed in the bottle and set on fire. The bottle is thrown at the structure causing the bottle to break on impact. The fire spreads through the spreading accelerant. Although he could find no definite physical evidence of a Molotov cocktail, Reedus concluded that one had been thrown through the large living room window to start the fire.

Detective Edward Kallay, Jr., a homicide detective who was the primary investigator in this matter for the Columbus Police Department ("CPD"), testified that, in January 2000, he had a conversation with a man named Adiyat Diggs. Based upon that conversation, Kallay believed that appel-lant might have information about a suspect who the police thought could have been involved in starting this fire. On April 24, 2000, Detective Kallay and Federal Special Agent Ozbolt spoke with appellant at the Southeastern Correctional Institution in Licking County where appellant was incarce-rated. Their conversation was recorded.

Detective Kallay testified that appellant told him that he had picked up a man named Daryl "Pumpkin" Kelly the day before the fire and took him to a bar to meet a woman named Leah.[FN1] Appellant waited outside while Daryl Kelly went into the bar. When Kelly and Leah came out, appellant heard Leah tell Kelly to "take care of this for me." Appellant told Detect-ive Kallay that he got a call from an excited Daryl Kelly the next morning who said he needed another ride. When appellant picked Kelly up, he said that Kelly smelled like gasoline. Daryl "Pumpkin" Kelly was a suspect even before appellant provided this information.

FN1. Leah was Leah Smith, a former friend of Aleta Bell who lived in the other half of the house at 151 South Wheatland Avenue. Days before the fire, Leah had moved out of the house. The two had been involved in a dispute earlier in the summer of 1997, when Aleta Bell accused Leah of forging a driver's license with Aleta's personal information but with Leah's picture. When Aleta found the driver's license, she took it back. Leah later broke into Aleta's home and stole the driver's license. Leah was charged with and pled guilty to one count of burglary arising from that incident.

Three days later, on April 27, 2000, Detective Kallay and Special Agent Ozbolt went to the Southeastern Correctional Institution to talk with appellant again. In a recorded conversation, appellant again implicated Leah and Kelly in the fire at 151 South Wheatland Avenue. Following this conversation, the officers obtained appellant's release on probation so that he would cooperate with them in their investigation. However, appellant failed to cooperate, leading the officers to believe that appellant had more to do with the fire than he was admitting. Due to appellant's failure to cooperate with the investigation and failure to abide by the terms of his probation, Detective Kallay arrested appellant on June 16, 2000.

After he was arrested, appellant was taken to CPD headquarters and interrogated by Detective Kallay and Special Agent Ozbolt. The interrogation was videotaped. It is undisputed that, prior to being questioned, appellant was read his *Miranda* rights. During questioning, appellant admitted his involvement in starting the fire. He said that he met Leah and Kelly the day before the fire when Leah asked appellant to take Kelly somewhere that night. Later that evening, Kelly and appellant took two empty bottles of alcohol and filled them with gasoline. They brought the bottles to Leah who showed them how to make a Molotov cocktail. Appellant and Kelly then went to the area of 151 South Wheatland Avenue and drove into an alley. After smoking some crack, Kelly got out of the car with the two bottles and, a few seconds later, appellant heard glass break and then saw Kelly running back towards the car without the bottles. The two sped away to a crack house, where they paged Leah. She arrived and paid them both with crack cocaine.

Detective Kallay further testified that, following these admissions, he made arrangements to have appellant take a polygraph test. On June 20, 2000, appellant was brought again to the CPD to take the test. It is undisputed that appellant was read his *Miranda* rights again. However, Detective Kallay testified that appellant was uncooperative so the test could not be performed. Appellant's lack of cooperation was confirmed by the testimony of Randy Walker, who had been hired to administer the test. Nevertheless, while in the room waiting to take the test, appellant made

5

more admissions regarding his involvement in the fire. Again, this interrogation was videotaped.

Appellant's recorded statements of April 24th April 27th and his video-taped confessions of June 16th and June 20th were played for the jury over appellant's objections.

The state then called Stanley Bowen, a Deputy Sheriff for Licking County. Deputy Bowen was employed as a supervisor at the jail in which appellant was incarcerated in April 2000. Deputy Bowen testified that he overheard appellant ask "why didn't they charge the bitch too. It was her idea to start the fire." In addition, an inmate, who was in a cell next to appellant, test-ified that appellant told him all about the fire. He said that appellant told him there were three people involved, and that they used Molotov cock-tails to firebomb the house.

At the conclusion of the state's case, appellant orally moved, pursuant to Crim.R. 29, for a judgment of acquittal on the entire indictment, based upon the state's alleged failure to prove the requisite *mens rea*. The trial court denied the motion. Appellant then was advised of his constitutional rights regarding his own testimony and he did not testify. The defense rested its case without presenting any witness and renewed its motion for judgment of acquittal, which again was denied by the trial court.

After deliberating, the jury returned verdicts finding appellant guilty of all five counts of attempted murder and felonious assault, guilty of one count of aggravated arson, guilty of the lesser included offense of murder of Shenequa Bell, and guilty of the aggravated felony-murder of Shenequa Bell, also finding appellant guilty of the death penalty specification because the aggravated murder was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons.

Subsequently, a mitigation hearing was held to determine the proper penalty for the death penalty count of the indictment. The jury found that the aggravating circumstances of the crime did not outweigh the mitigate-ing circumstances beyond a reasonable doubt and, therefore, voted to impose a sentence of life imprisonment without parole eligibility for thirty years. The trial court sentenced appellant on all counts to a total of 90 years in prison.

*State v. Simpson*, 2002 WL 1625559, *1 - *3 (Ohio Ct.App. 10th Dist. July 23, 2002).

**SCOPE OF REMAND**

The remand is "for further consideration in light of *Howes*." *Simpson v. Jackson*, No. 08-3244 (6th Cir. June 28, 2013), *see* Doc. No. 65, PageID# 434. This constitutes a "GVR" (grant, vacate, and remand order) or limited remand which constrains the Court to address only the effect of *Howes* on this case. *See United States v. Bowers*, 220 Fed.Appx. 402, 404-05 (6th Cir. March 19, 2007)(GVR constrains review to issue of application of *United States v. Booker,* 543 U.S. 220 (2005)(quoting *United States v. Orlando*, 363 F.3d 596, 601 (6th Cir. 2004)); *see also In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation,* 722 F.3d 838, 845 (6th Cir. 2013)(GVR constrains review to application of *Comcast Corp. v. Behrend*, -- U.S. --, 133 S.Ct. 1426)(citations omitted.)    A GVR does not constitute a reversal on the merits, or suggest that the Circuit Court's decision is erroneous.

> In *Stutson v. United States*, 516 U.S. 193, 197–98, 116 S.Ct. 600, 133 L.Ed.2d 571 (1996), for example, the Court issued a GVR directing the Eleventh Circuit to reconsider that case in light of the Supreme Court's decision in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). Focusing on the fact that the Eleventh Circuit did not fully consider whether *Pioneer* applied, and classifying *Pioneer* as a " potentially relevant decision[ ]," 516 U.S. at 197, 116 S.Ct. 600 (emphasis added), the *Stutson* Court acknowledged that the Eleventh Circuit may "conclude that *Pioneer* does not apply" and thus reach the same result on remand. *Id.* at 196, 116 S.Ct. 600.

*Communities for Equity v. Michigan High School,* 459 F.3d 676, 680 (6th Cir. 2006).

> A GVR does not bind the lower court to which the case is remanded; that court is free to determine whether its original decision is still correct in light of the changed circumstances or whether a different result is more appropriate. . . .  Because the lower court can decide either way—the Supreme Court not having specified or even suggested which merits outcome is correct—the Court cannot be said to have issued a decision regarding the validity of any convictions. Instead, the GVR merely allows a

7

>lower court to reconsider its judgment in light of new circum-
>stances[.]

*Kenemore v. Roy*, 690 F.3d 639, 642 (5th Cir. 2012)(footnote omitted).

Under the terms of the remand from the Court of Appeals for the Sixth Circuit, therefore, this Court's review is limited to the application of *Howes,* which deals with the constitutionality of the prisoner interrogations by police.

In *Howes v. Fields,* 132 S.Ct. at 1181, the Supreme Court declined to adopted a "categoryical rule" requiring that all interrogations of a prisoner regarding events that occurred outside of the prison be considered to be custodial interrogations within the protections of *Miranda v. Arizona,* 384 U.S. 436 (1966).[2] *Id.* at 1187, 1188.

>Not only does the categorical rule . . . go well beyond anything
>that is clearly established in our prior decisions, it is simply wrong.
>The three elements of that rule—(1) imprisonment, (2) questioning
>in private, and (3) questioning about events in the outside world—
>are not necessarily enough to create a custodial situation for *Mir-
>anda* purposes.

*Id*. at 1189.  The "in private" questioning of an inmate about events that took place outside the prison does not, by itself, establish that a prisoner is "in custody" for purposes of *Miranda*.  *Id*. at 1191.  "[T]he determination of custody should focus on all of the features of the interrogation . . . [including] the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted."  *Id*. at 1192.

---

[2] In *Miranda v. Arizona*, 384 U.S. 478-79, the Supreme Court held:

[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning. . . . He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him. *Id.*

Howes did not invite or consent to the interview with police in advance, nor was he advised "that he was free to decline to speak with the deputies." *Id*. at 1192-93.

> The interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed; the deputies who questioned respondent were armed; and one of the deputies, according to respondent, "[u]sed a very sharp tone," App. to Pet. for Cert. 76a, and, on one occasion, profanity, see *id*., at 77a.

*Id*. at 1193. "Most important" to consideration of the custody determination, the Supreme Court stated, was the fact that Howes

> was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted. See *id.*, at 89a–90a ("I was told I could get up and leave whenever I wanted"); id., at 70a–71a. Moreover, [Howes] was not physically restrained or threatened and was interviewed in a well-lit, average-sized conference room, where he was "not uncomfortable." *Id*., at 90a; see *id*., at 71a, 88a–89a. He was offered food and water, and the door to the conference room was sometimes left open. See *id*., at 70a, 74a.

*Howes*, at 1193. "All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Id.* (citing *Yarborough v. Alvarado*, 541 U.S 652, 664–665 (2004)). The Supreme Court reasoned:

> Because he was in prison, [Howes] was not free to leave the conference room by himself and to make his own way through the facility to his cell. Instead, he was escorted to the conference room and, when he ultimately decided to end the interview, he had to wait about 20 minutes for a corrections officer to arrive and escort him to his cell. But he would have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning; under no circumstances could he have reasonably expected to be able to roam free. And while [Howes] testified that he "was told ... if I did not want to cooperate, I needed to go back to my cell," these words did not coerce cooperation by threatening harsher conditions. App. to Pet. for Cert. 71a; see *id*., at 89a ("I was told, if I didn't want to cooperate,

> I could leave"). Returning to his cell would merely have returned him to his usual environment.

*Howes*, 132 S.Ct. at 1193-94 (footnote omitted).  Under these circumstances, the Supreme Court held that Howes was not "in custody" such that the protections of *Miranda* applied. *Howes,* at 1194.

The Magistrate Judge therefore turns to the application of *Howes* to petitioner's April and June 2000 admissions to police.

### JUNE 16, 2000, STATEMENTS

Each Court to review the issue has concluded that the trial court committed no error in admitting Simpson's June 16th incriminating statements to police.  On that date, police had arrested him for violating the terms of his judicial release and failing to cooperate.  Simpson confessed to his involvement in the crime.  Police videotaped the exchange.  *See Simpson v. Jackson*, 615 F.3d at 425-26 (citing *State v. Simpson*, No. 01-AP-757, 2002 WL 1625559, at *1 (Ohio App. 10th Dist. July 23, 2001).  He made these admissions at the Columbus Police Headquarters and after police read him his *Miranda* rights.  He signed a form acknowledging that he understood and agreed to waive those rights. *Id.*

Petitioner argues that police violated *Miranda* when they questioned him after he expressed his desire to remain silent.  *Simpson v. Jackson,* 615 F.3d at 430.  The Sixth Circuit rejected this argument, finding that "the officers validly obtained the waiver of Simpson's *Miranda* rights prior to the June 16th interview." The United States Court of Appeals for the Sixth Circuit also rejected petitioner's argument that his June 16th statement was coerced based on the use of threats and promises.  *Id.* at 434.

Petitioner's custodial status was not at issue in the decision.   Respondent and petitioner agree that Simpson's June 16th statements remain unaffected by the Supreme Court's decision in

*Howes.* *See Respondent's Brief in Response*, Doc. No. 83, PageID# 4178; *Simpson's Supplemental Reply Brief,* Doc. No. 84, PageID# 4220; *Transcript, Oral Arguments*, Doc. No. 85, PageID# 4251.

The Magistrate Judge agrees. Simpson's June 16th statements properly were admitted against him at trial, and the issue need not be considered in view of *Howes*.

### JUNE 20, 2000, STATEMENTS

The Sixth Circuit Court of Appeals rejected petitioner's claim that police coerced his June 20, 2000, statements to police through the use of false promises, threats and misleading statements, *See Simpson v. Jackson,* 615 F.3d at 434, but granted relief on petitioner's claim that police "violated *Miranda* by discouraging him from consulting with an attorney." *Id.* "[W]e find that the state court's admission of the June 20th statement was an unreasonable application of Supreme Court precedent." *Id.* at 438.

The Sixth Circuit reasoned:

> Coming into the June 20th interview, Simpson had already given incriminating statements on June 16th. He had confessed to being with Kelly immediately prior to the arson while Kelly prepared the Molotov cocktail and to driving the car before and after Kelly threw the Molotov cocktail at the house, though he disclaimed having been involved in the planning of the attack or having any intent to kill or harm anyone. Detective Kallay and Agent Ozbolt seem to have suspected that Simpson was more involved than he claimed. They therefore proposed, at the end of the June 16th interview, that Simpson take a polygraph test. They essentially told him that, if he had been completely truthful on the 16th, he would pass the test and they would continue to work with him and seek favorable treatment from the prosecutor. If he failed the lie detector, they would "know" that he was more involved than he had admitted, and the officers would recommend that the prosecutor bring the most serious possible charges against Simpson. Thus, the officers proposed the lie detector for two purposes. The first purpose was to test the truth of Simpson's June 16th statement. The second purpose was to get Simpson to confess to his "true" role in the arson by telling him that, if he lied, the test

would pick it up, so he should come clean before the test. On June 16th, Simpson initially agreed to take the test. However, he was less than cooperative when the time actually arrived on June 20th.

* * *

At the beginning of the June 20th interview, in preparation for the polygraph exam, Kallay had more strong words for Simpson. He stated at various times, "You don't cooperate on this case, you eat the whole thing. It's called agg murder—conspiracy to commit.... If you don't cooperate then ... there are no holds barred, and you're gonna lose. You're gonna spend the rest of your life in jail.... If you don't take the test today ... we're gonna file the paper on you today for complicity to commit agg murder. It's that simple." (A514–15, 518.)

* * *

### b. Right to Counsel

Simpson . . . contends that the police violated *Miranda* by suggesting that he needed an attorney only if he was lying. When the polygraph examiner, Officer Walker, began discussing Simpson's *Miranda* rights and indicated that Simpson had the right to have counsel present, Simpson replied, "Oh, I can have an attorney present?" (A528.) Walker responded, "You c-can any-anytime, you can always have an attorney present. It is my understanding that you wanted to take the test." (*Id.*) Simpson understandably seems to have taken this to mean that, if he wanted an attorney present, he would not be able to take the test that day. Furthermore, he had already been told that if he did not take the polygraph that day, he would be charged with aggravated murder immediately. . . [T]his is not problematic under *Miranda* because it was essentially the truth. The problem arises in what happened next:

Walker: Do you follow what I'm sayin'? That's ... if you're telling me the truth, then you won't have a problem with the test. If you're lying, then, uh, yeah, if I was lying, I probably would, I'd probably get an attorney, I probably wouldn't take the test.

Simpson: Oh.

Walker: Yea, well, that's me. But that's a decision that, yeah, you know, you have to make. This part of the form is wordy and is-is lengthy. What this says is, that you are giving me permission to give you the exam.

12

(A531–32.)

Simpson claims that we have held a materially identical exchange to violate *Miranda*. In *Kyger*, we addressed a situation in which the following transpired:

Officer: Steve, do you understand them rights?

Kyger: Yes, sir.

Officer: Alright, having them rights in mind, would you answer some of our questions, without an attorney present?

Kyger: I'd just as soon have an attorney [']cause, you know ya'll say there's been a shooting involved and that's a serious charge.

Officer: Yes it is but we're investigating. We're not saying you shot anybody. We're just investigating. Now, if you've got something to hide, I can understand you not wanting to sign that. If you ain't got nothing to hide, you know, you can answer our questions.

Kyger: I ain't got nothing to hide.

Officer: Okay. But you don't want to answer our questions without an attorney present now?

Kyger: You know, I'll answer a certain amount, you know.

Officer: Okay, you know well you know you have the right to stop at any time. That's (inaudible) ...

Kyger: Where do I sign at?

Officer: Just where it says "sign."

Kyger: Okay [Kyger then signs].

146 F.3d at 376–77 (emphasis added). In light of this colloquy, we found that Kyger's statement was a request for counsel, such that the interrogation should have stopped immediately. *Id.* at 379. Importantly, however, we went on to state that:

[Even] if Kyger's request was equivocal, the subsequent statement by the police ("Now, if you've got some-

thing to hide, I can understand you not wanting to sign that. If you ain't got nothing to hide, you know, you can answer our questions.") was an inappropriate effort at pressuring Kyger to answer, rather than an appropriate attempt to get Kyger to clarify his response. This would also render this questioning constitutionally infirm. See *Miranda,* 384 U.S. at 454, 86 S.Ct. 1602 (disapproving of just such a tactic); *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (approving the use of clarifying questions).

*Id.* (citation omitted). As the *Kyger* Court noted, *Miranda* itself spoke ill of an interrogation technique in which the interrogator tries to dissuade a suspect from speaking with an attorney by saying "Joe, I'm only looking for the truth, and if you're telling the truth, that's it. You can handle this by yourself." 384 U.S. at 454–55, 86 S.Ct. 1602.FN5

FN5. Kyger was not decided under AEDPA because the petition had been filed prior to 1996. However, this is immaterial because the relevant proposition from *Kyger* is that the statement in question was a clear violation of Supreme Court precedent. This application of *Miranda* was not affected by the subsequent passage of AEDPA.

The warden concedes that the statement in *Kyger* is similar to the statement by Officer Walker in this case. However, the warden seeks to distinguish the cases on the temporal basis that *Kyger* involved a suspect who had stated that he wanted to speak to an attorney whereas Simpson had not yet requested counsel. We find two faults with the warden's attempt at distinction.

First, *Kyger* expressly stated that the officer's statement was inappropriate even if Kyger had only made an equivocal request for counsel, as opposed to a clear request for counsel. 146 F.3d at 379. Here, though Simpson's statement was certainly not an un-equivocal request for counsel, it was at least an equivocal expression that he was considering speaking to counsel. Indeed, that Officer Walker responded with a clarifying statement ("You c-can any-anytime, you can always have an attorney present. It is my understanding that you wanted to take the test.")—which was appropriate under *Davis*, 512 U.S. at 461, 114 S.Ct. 2350—shows that Officer Walker thought that Simpson might have been request-ing counsel. Thus, because Simpson's statement was an equivocal statement about his desire for counsel, *Kyger* is on all fours.

14

Second, and more troubling, to accept the warden's distinction would be to accept a rule that police may not discourage interviewees from persisting with their request for counsel after they have already requested counsel, but may preemptively discourage them from seeking the advice of counsel after informing them of the right to counsel but before they actually request counsel. The warden offers no authority, and we are aware of none, endorsing such a strange proposition. In essence, to accept the warden's distinction would be to approve the following alteration of the *Miranda* warnings: "You have the right to an attorney, but you only need to exercise that right if you are guilty or are lying." This would be an unreasonable rule and an unreasonable reading of *Miranda*, which expressly disapproved of such a tactic. *Miranda*, 384 U.S. at 454–55, 86 S.Ct. 1602.

Here, Officer Walker indicated to Simpson that he only needed a lawyer if he had lied or intended to lie, and such a tactic is highly likely to taint an interviewee's decision-making calculus. The obvious takeaway from the perspective of someone in Simpson's position is that, if he requested an attorney, he would be admitting to lying, which would result in his immediately being charged with aggravated murder. Thus, his only other option, as stated by Officer Walker, was to take the polygraph that day without the assistance of counsel.

Framing the issue in this way is inherently coercive and violative of *Miranda*. Furthermore, in so doing, Officer Walker crossed the line from stating the truth to distorting the truth and, arguably, to giving legal advice. Officers run a high risk when they move into the realm of offering advice. It is quite possible that, had Simpson spoken with an attorney, the attorney could have arranged for a polygraph at a later date. Officer Walker essentially advised Simpson to the contrary. As the Fifth Circuit—in a case in which officers responded to an equivocal request for counsel by stating that "an attorney could not relate [the suspect's] story to the police, and [the officer] explained that an attorney would probably advise him to say nothing"—explained:

> [T]he limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between interrogators and suspect about whether having counsel would be in the suspect's best interests or not. Nor may it incorporate a presumption by the interrogator to tell the suspect what counsel's advice to him would be if he were present. Such measures are

foreign to the purpose of clarification, which is not to persuade but to discern.

Officer Cunningham's explanation of the consequences of the suspect's talking to counsel might have been innocuous, even proper, had it been correct.... But even such explanations are perilous and, if given, must not be materially incorrect.

Here they were incorrect: it was simply not true, as Thompson was told, that "if he told his attorney he could not tell his side of the story.".... The point is that counsel's advice about what is best for the suspect to do is for counsel, not the interrogator, to give. And it is for him to give after consultation with his client and after weighing where the suspect's best interests lie from the point of view of the suspect, not from that of a policeman be he ever so well intentioned. Until this occurs, it is simply impossible to predict what counsel's advice would be; and even if it were, the right to advice of counsel surely is the right to advice from counsel, not from the interrogator.

*Thompson v. Wainwright*, 601 F.2d 768, 769, 772 (5th Cir. 1979).

*Thompson*'s reasoning applies with equal force here. Simpson correctly viewed Officer Walker as having superior knowledge about his circumstances and options. Officer Walker crossed the line separating adversary from advisor when he said that Simpson only needed an attorney if he was lying. Not only was this not true as a matter of legal strategy, as lawyers routinely instruct even innocent clients not to speak with the police, but, even if it were true, it was not Officer Walker's place to give the advice. Thus, because *Miranda* itself expressly disapproved of the tactics used here, as confirmed by *Kyg*er,FN6 and because the warden's attempt to distinguish *Kyger* is unpersuasive, we find that the state court's admission of the June 20th statement was an unreasonable application of Supreme Court precedent.

FN6. "Although only Supreme Court case law is relevant under the AEDPA in examining what Federal law is 'clearly established,' the decisions of the United States Courts of Appeals may be informative to the extent we have already reviewed and interpreted the relevant Supreme court case law to determine whether a legal principle or right has been clearly established by

the Supreme Court." *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir.
t2003).

*Simpson v. Jackson*, 615 F.3d at 434-45.

Petitioner asserts that *Howes* has no bearing on Sixth Circuit's holding that his June 20th statements were improperly admitted at trial. *Petitioner's Supplemental Brief,* Doc. No. 80, PageID# 4138; *Transcript, Oral Arguments*, Doc. No. 85, PageID# 4239; 4270-71. Respondent does not agree. *Respondent's Brief in Response*, Doc. No. 83, PageID# 4186. Because, as set forth above, petitioner's custodial status was not determinative of the Sixth Circuit's holding that the trial court improperly admitted Simpson's statements on June 20th the magistrate judge is not persuaded by respondent's argument that this issue need now be considered here.

Respondent argues that petitioner failed to establish that police coerced his statements on June 20, 2000, and that this issue is properly before the district court pursuant to the remand of the Court of Appeals.[3] *Id.* PageID# 4181; 4184; *Petitioner's Supplemental Response*, Doc. No. 84, PageID# 4200; 4202-04. Respondent further argues that admission of Simpson's June 16, 2000, statements, alone, establishes his intent to commit aggravated murder, murder, and attempted murder, and that therefore, the improper admission of his June 20, 2000, statements constitutes harmless error. *Respondent's Brief in Response*, Doc. No. 83, PageID# 4190-91; *Transcript, Oral Arguments,* Doc. No. 85, PageID# 4265.

Petitioner counters that respondent has waived the issue of harmless error by failing previously to raise the issue. Alternatively, petitioner contends that admission of Simpson's June 20, 2000, statements does not constitute harmless error.[4] *Transcript, Oral Arguments,* PageID#

---

[3] Petitioner indicates that the respondent previously conceded that *Howes* had no effect on the admission of Simpon's June 20, 2000, statements. *See Petitioner's Supplemental Brief*, Doc. No. 80, PageID# 4138 (referring to Warden Supp. Br. 40, No. 08-3224 (6th Cir. July 26, 2012).

4271; *Petitioner's Supplemental Brief*, Doc. No. 84, PageID# 4201.   Petitioner further argues

that the district court should reinstate habeas corpus relief based on the improper admission of

his June 20th and June 16th statements, alone.  *Simpson's Supplemental Brief*, Doc. No. 80,

PageID# 4146.

Petitioner's argument that the improper admission of his June 20th and June 16th

statements, alone, warrant relief is foreclosed by the decision of the Sixth Circuit, as is

respondent's argument that improper admission of his June 20th statements constitute harmless

error:

> Coming into the June 20th interview, Simpson had already
> given incriminating statements on June 16th. He had confessed to
> being with Kelly immediately prior to the arson while Kelly pre-
> pared the Molotov cocktail and to driving the car before and after
> Kelly threw the Molotov cocktail at the house, though he dis-
> claimed having been involved in the planning of the attack or
> having any intent to kill or harm anyone.

*Simpson v. Jackson*, 615 F.3d at 434.  Simpson's June 16th statements fail to establish his

intent to commit the crimes at issue:

> . . . Simpson's statements were, by far, the most damning
> evidence against him. *Simpson,* 2002 WL 1625559, *5, 2002 Ohio
> App. LEXIS 3785, at * 13 ("Without question, the most incrim-
> inating evidence presented against appellant at trial were his own
> statements.") There was no physical evidence or eyewitness link-
> ing him to the arson. Aside from his statements, only two other
> pieces of evidence potentially implicated Simpson: (1) a sheriff's
> deputy at the local jail testified that he overheard Simpson ask
> "why didn't they charge the bitch too. It was her idea to start the
> fire."; and (2) an inmate from a cell next to Simpson testified that
> Simpson told him that there were three people involved in the fire,
> he was one of them, and that they used Molotov cocktails.
> (A2249).

*Id*. at 442.

---

[4] The prejudicial impact of Simpson's June 20, 2000, statements must be assessed in light of his April 2000, statements.  This Court therefore will defer consideration regarding the issue of harmless error.

The June 20th statement was, for lack of a better description, all over the place. Simpson never actually took the polygraph, but spoke at length with the man who would be the polygraph examiner. At one point, he retracted his admissions of June 16th, returning to the position he took in April that he was not involved at all. However, after further pressure from Kallay and Ozbolt, Simpson admitted to being even more involved than he had admitted in his June 16th statement. He admitted: (1) to hearing Leah and Kelly discuss the arson one week before it happened (A638–39); (2) that, on the day of the arson, he heard Leah tell Kelly that she wanted the house "blown up" (A632); and (3) that he heard Leah tell Kelly how to make a Molotov cocktail (A642–44). Simpson's admissions on June 20th were, by far, the strongest evidence of not only his involvement in the arson, but also the extent of his knowledge and involvement before, during, and after the arson.

However, even in the June 20th statement, Simpson still maintained that he had not been involved in the planning of the arson or in making the Molotov cocktails, and had no intent to kill anyone.  Thus, to prove that Simpson acted with the purpose of causing the death of another, the State needed something more than Simpson's own admissions.  Creatively, the State turned to Simpson's April denials to prove this element.

*Id*. (emphasis added).  Thus, the Sixth Circuit's decision on the admissibility of

Simpson's statements explicitly rejects petitioner's claim that admission of his June 16th and

June 20th statements, alone, warrant relief. Respondent's argument that Simpson's June 16th

statements, alone, establish petitioner's intent to commit aggravated murder, murder, and

attempted murder, and that the improper admission of his June 20, 2000, constitutes harmless

error also is precluded by the decision of the United States Court of Appeals.

**APRIL STATEMENTS**

The state appellate court made the following relevant findings of fact in regard to

Simpson's April 24, 2000, and April 27, 2000, statements:

Detective Edward Kallay, Jr., a homicide detective who was the primary investigator in this matter for the Columbus Police Department ("CPD"), testified that, in January 2000, he had a conversation with a man named Adiyat Diggs. Based upon that conversation, Kallay believed that appellant might have information about a suspect who the police thought could have been involved in starting this fire. On April 24, 2000, Detective Kallay and Federal Special Agent Ozbolt spoke with appellant at the Southeastern Correctional Institution in Licking County where appellant was incarcerated. Their conversation was recorded.

Detective Kallay testified that appellant told him that he had picked up a man named Daryl "Pumpkin" Kelly the day before the fire and took him to a bar to meet a woman named Leah. FN1 Appellant waited outside while Daryl Kelly went into the bar. When Kelly and Leah came out, appellant heard Leah tell Kelly to "take care of this for me." Appellant told Detective Kallay that he got a call from an excited Daryl Kelly the next morning who said he needed another ride. When appellant picked Kelly up, he said that Kelly smelled like gasoline. Daryl "Pumpkin" Kelly was a suspect even before appellant provided this information.

FN1. Leah was Leah Smith, a former friend of Aleta Bell who lived in the other half of the house at 151 South Wheatland Avenue. Days before the fire, Leah had moved out of the house. The two had been involved in a dispute earlier in the summer of 1997, when Aleta Bell accused Leah of forging a driver's license with Aleta's personal information but with Leah's picture. When Aleta found the driver's license, she took it back. Leah later broke into Aleta's home and stole the driver's license. Leah was charged with and pled guilty to one count of burglary arising from that incident.

Three days later, on April 27, 2000, Detective Kallay and Special Agent Ozbolt went to the Southeastern Correctional Institution to talk with appellant again. In a recorded conversation, appellant again implicated Leah and Kelly in the fire at 151 South Wheatland Avenue. Following this conversation, the officers obtained appellant's release on probation so that he would cooperate with them in their investigation. However, appellant failed to

cooperate, leading the officers to believe that appellant had more to do with the fire than he was admitting. Due to appellant's failure to cooperate with the investigation and failure to abide by the terms of his probation, Detective Kallay arrested appellant on June 16, 2000.

*State v. Simpson*, 2002 WL 1625559, at *2-3. The United States Court of Appeals for the Sixth Circuit recited the following additional undisputed facts:

> The April 24th interview was held in a conference room in the warden's office. Simpson was pulled from the general prison population and escorted to the warden's office by prison guards. (Appellee's Br. at 16–17.) During the interview, the officers, on the one hand, accused Simpson of being with Kelly at the time of the incident but, on the other hand, told him that he was not a suspect. (A63–64, A133.) FN1 The April 27th interview occurred while Simpson was in the prison's infirmary. (A136–37 ("Q: Okay. And again, how was that meeting arranged? A: They just came down there [the infirmary].").)

*Simpson v. Jackson*, 615 F.3d at 426-27 (footnote omitted).

The transcript of the hearing on the motion to suppress indicates that Simpson's April 24th interview lasted approximately one hour and the April 27th interview lasted approximately thirty minutes. *Transcript,* Doc. No. 79-1, PageID# 1285. According to police, they did not consider Petitioner a suspect at that time of either of these discussions, and would have advised him of his rights under *Miranda,* had petitioner admitted to his involvement. PageID# 1239-41; 1267. The police were aware of the fact that Simpson had an application for judicial release pending before the Licking County Court of Common Pleas at the time of his questioning. PageID# 1267. Additionally, a new child had recently been born to his family, and he wanted to see him/her. PageID# 1267. Police "struck a deal" with him – they would arrange his release if he would cooperate in their investigation. PageID# 1267-68. The April 27th meeting with Simpson was "essentially a follow-up" to the meeting of April 24th. PageID# 1268. "We had gone back down and tried to confirm the fact whether or not he was going to help us get information from

the main suspect, who is Daryl Kelly[.]"  PageID# 1241.  "The second contact was more to finalize trying to get him out of prison to help us on the Shenequa Bell homicide[.]"  PageID# 1247.  Based on the April conversations with Simpson, police arranged to have him released from prison.  PageID# 1248.  In return, Simpson was supposed to obtain recorded conversations from Daryl Kelly regarding the arson.  PageID# 1249.

The United States Court of Appeals for the Sixth Circuit held that police unconstitutionally obtained Simpson's April 2000 statement, because Simpson was "in custody" at the time he was being questioned, and police failed to advise him of his *Miranda* rights.  The Sixth Circuit reasoned:

> The June statements were preceded by two interrogations in April, on the 24th and the 27th, during which time Simpson was in jail for a separate offense. Acting on a tip that Simpson might have known something about the arson, Detective Kallay and Agent Ozbolt arranged to meet with Simpson in jail. In his April statements, Simpson denied any involvement at all in the arson. He claimed, however, to know that "Pumpkin" Kelly and Leah met the day before the incident. He also claimed that Kelly had called Simpson to request a ride around the time of the fire and that, when he picked Kelly up, Kelly was excited and smelled like gasoline. The officers did not administer *Miranda* warnings at the outset of either interview.

> Simpson later moved to suppress both April statements due to the officers' failure to give *Miranda* warnings. The state court overruled the motion on the basis that Simpson was not in "custody" under *Miranda* during the interrogations, so no warnings were required. At trial, the prosecutor introduced the two statements for the purpose of showing that Simpson had not been truthful with the police in April. The prosecutor sought to show that, because Simpson lied to the officers in April by denying involvement completely, he similarly lied in his June statements when he admitted to only limited involvement. In other words, the prosecutor asked the jury to credit Simpson's June statements up to the point that he implicated himself at all. However, the prosecutor urged the jury not to credit the June statements insofar as Simpson minimized his involvement in the arson, and pointed to the April statements as proof of why the jury should so conclude. The state

appellate court affirmed the trial court's ruling, and it further held that any error in admitting the evidence was harmless because the April statements were not inculpatory on their face.

The state court held that, although Simpson was in prison at the time of the April statements, he was not in custody for purposes of *Miranda* and, thus, no warnings were required. In so holding, the state court cited a string of cases from various circuits, primarily the Ninth Circuit's decision in *Cervantes v. Walker*, 589 F.2d 424 (9th Cir.1978), FN7 that have concluded that simply being incarcerated does not, by itself, constitute custody for *Miranda* purposes. Instead, the question under these cases is whether there has been a "change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Id*. at 428. The state court's reliance upon this line of circuit cases was contrary to factually indistinguishable Supreme Court case law, *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).
`
FN7. We noted the *Cervantes* reasoning with approval in *dicta* in *United States v. Ozuna*, 170 F.3d 654, 658 n. 3 (6th Cir.1999). However, C*ervantes* deals with a substantially different fact pattern than this case. There, and in almost every other federal circuit court case to have applied *Cervantes,* the prisoner was being questioned about something that happened in prison. E.g. *Garcia v. Singletary*, 13 F.3d 1487, 1490–92 (11th Cir.1994) (prisoner not in *Miranda* custody when prison guard responding to a fire in prisoner's cell asked prisoner "why he set the fire"). Cervantes actually distinguished *Mathis* on this basis. 589 F.2d at 427. The only other cases to have applied *Cervantes* did so to find that a prisoner who initiated contact with police was not in *Miranda* custody at the time of the contact. *E.g. Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988) (prisoner not in *Miranda* custody when prisoner called police to discuss a crime). So, while Cervantes may be persuasive in cases involving the questioning of prisoners about events that occurred in prison or instances of prisoners initiating contact with police, it is inapposite in cases of the police initiating an interrogation of a prisoner about a completely different offense or something that happened beyond the prison walls. *Mathis* controls in those circumstances.

In *Mathis,* the Supreme Court addressed the admissibility of statements given without *Miranda* warnings in a case, like this one, in which the individual was in prison serving a sentence on an unrelated state crime. *Id*. at 2, 88 S.Ct. 1503. The government contended that the statements were admissible because "the petitioner had not been put in jail by the officers questioning him, but was

there for an entirely separate offense," *id*. at 4, 88 S.Ct. 1503, or, in other words, because the petitioner was not in *Miranda* custody during the interviews. The Supreme Court concluded that this argument was "too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." *Id*. The Court went on to state that restricting *Miranda* protections to those that are in custody for the case under investigation would go "against the whole purpose of the *Miranda* decision" and that there was "nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Id. at* 4–5. And to punctuate the matter with clarity, the Court stated:

> In speaking of "custody" the language of the *Miranda* opinion is clear and unequivocal: "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."

*Id*. at 5, 88 S.Ct. 1503 (quoting *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602). Indeed, in dissent, Justice White objected to the majority's "cavalier" extension of the definition of *Miranda c*ustody. *Id*. at 7, 88 S.Ct. 1503 (White, J., dissenting).

There is no relevant factual distinction between *Mathis* and the circumstances of Simpson's April statements. Quite tellingly, the state court never cited *Mathis.* Here, as in *Mathis*, state agents unaffiliated with the prison isolated an inmate and questioned him about an unrelated incident without first giving *Miranda* warnings. The Supreme Court ruled that such action was improper and that any resulting statements must be suppressed. FN8 As there is no material factual distinction, the April statements were admitted contrary to Supreme Court precedent.

FN8. We note that the Supreme Court recently made clear that an inmate in Simpson's situation is in *Miranda* custody when he is being questioned by authorities on an unrelated crime. In *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), the Court addressed the question of when, if ever, may the police re-initiate contact with a suspect after he has invoked his right to counsel. Like Simpson, Shatzer was in jail. Officers came to the and he invoked his right to counsel. The interview ceased and Shatzer was returned to the prison population. Two and one half years later, another officer came back to the jail and sought again

to question Shatzer about the crime. This time, he waived his
*Miranda* rights and made incriminating statements. He later sought
to suppress his statement on the basis that he had never left *Mir-
anda* custody after the first interview and, thus, police improperly
re-initiated interrogation in violation of *Edwards.* The Supreme
Court disagreed, holding that there had been a break in *Miranda*
custody once Shatzer had been returned to the general prison
population.

But, in the process of making this holding, the Supreme Court
stated that "[n]o one questions that Shatzer was in custody for
*Miranda* purposes during the interviews" with officers while in
jail. 130 S.Ct. at 1224. And in holding that the period of time
between the two interviews, but during which Shatzer remained
incarcerated on the unrelated offense, did not constitute *Miranda*
custody, the Court stated, "[w]e distinguish the duration of incar-
ceration from the duration of what might be termed interrogative
custody. When a prisoner is removed from the general prison
population and taken to a separate location for questioning, the
duration of that separation is assuredly dependent upon his inter-
rogators" such that the period of "interrogative custody" consti-
tutes *Miranda* custody. *Id*. at 1225 n. 8 (emphasis in original).
Though not controlling because *Shatzer* post-dates the state court's
decision in Simpson's case, it is clear that the Supreme Court
would find that Simpson's April interviews occurred while he was
in *Miranda* custody.

 *Simpson v. Jackson*, 615 F.3d at 439-442.

The parties do not dispute that *Howes* applies to the April statements to police.  In

*Howes*, the Supreme Court stated that the determination of a whether a prisoner is "in custody"

as defined under *Miranda* depends on whether he is under the type of coercive pressure that

*Miranda* was designed to guard against.

As used in our *Mira*nda case law, "custody" is a term of art that
specifies circumstances that are thought generally to present a
serious danger of coercion. In determining whether a person is in
custody in this sense, the initial step is to ascertain whether, in light
of "the objective circumstances of the interrogation," *Stansbury v.
California*, 511 U.S. 318, 322–323, 325, 114 S.Ct. 1526, 128
L.Ed.2d 293 (1994) (per curiam), a "reasonable person [would]
have felt he or she was not at liberty to terminate the interrogation
and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct.

> 457, 133 L.Ed.2d 383 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury, supra*, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, *see Shatzer, supra*, at —— – ——, 130 S.Ct., at 1223–1226, its duration, *see Berkemer v. McCarty*, 468 U.S. 420, 437–438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, *see Mathiason, supra*, at 495, 97 S.Ct. 711; *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Stansbury, supra*, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, *see New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see *California v. Beheler*, 463 U.S. 1121, 1122–1123, 103 S.Ct. 3517, 77 L.Ed.2d *1275 (1983) (per curiam).*

*Howes,* 132 S.Ct. at 1189.

The record reflects that on April 24, 2000, police escorted Simpson to a conference room within the prison. On April 27, 2000, they spoke to him in the infirmary. The duration of the questioning on April 24, 2000, lasted approximately one hour. On April 27, 2000, the questioning lasted approximately thirty minutes. Police assured Simpson he was not a suspect in the crimes, and promised his release from prison if he assisted them in the investigation. The record does not indicate that he was physically restrained. On April 24th, he was released at the end of the questioning.

Custodial status is not determined by a prisoner's incarceration alone, because a person already serving a prison term is already under a restraint of his freedom and therefore not subject to the "sharp and ominous change" or coercive pressure against which *Miranda* is designed to protect. *Howes*, 615 F.3d at 1190-91.

> "Interrogated suspects who have previously been convicted of crime live in prison." *Shatzer,* 559 U.S., at ——, 130 S.Ct., at 1224. For a person serving a term of incarceration, we reasoned in *Shatzer,* the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the

26

> same "inherently compelling pressures" that are often present
> when a suspect is yanked from familiar surroundings in the outside
> world and subjected to interrogation in a police station. *Id.*, at ——,
> 130 S.Ct., at 1219.

*Id.* at 1191.  The Court must also consider, however, whether the person being questioned is

likely "to be lured into speaking by a longing for prompt release." *Howes*, 615 S.Ct. at 1191

> When a person is arrested and taken to a station house for
> interrogation, the person who is questioned may be pressured to
> speak by the hope that, after doing so, he will be allowed to leave
> and go home. On the other hand, when a prisoner is questioned, he
> knows that when the questioning ceases, he will remain under
> confinement. *Id.*, at ——, n. 8, 130 S.Ct., at 1224–1225, n. 8.
> . . . [A] prisoner, unlike a person who has not been convicted
> and sentenced, knows that the law enforcement officers who
> question him probably lack the authority to affect the duration of
> his sentence. *Id.*, at —— – ——, 130 S.Ct., at 1224–1225. And
> "where the possibility of parole exists," the interrogating officers
> probably also lack the power to bring about an early release. *Ibid.*
> "When the suspect has no reason to think that the listeners have
> official power over him, it should not be assumed that his words
> are motivated by the reaction he expects from his listeners." *Per-
> kins*, 496 U.S., at 297, 110 S.Ct. 2394. Under such circumstances,
> there is little "basis for the assumption that a suspect ... will feel
> compelled to speak by the fear of reprisal for remaining silent or in
> the hope of [a] more lenient treatment should he confess." *Id.*, at
> 296–297, 110 S.Ct. 2394.

*Howes*, at 1191.

Here, the facts make clear that the officers who questioned Simpson knew of his request and

desire for release, and used the promise of obtaining his early release from prison to pressure him

to cooperate and disclose his knowledge of the crimes charged.  In fact, they did obtain his re-

lease and later arrested him upon his failure to cooperate as he had agreed.  Additionally, unlike

the situation in *Howes,* where police repeatedly told Howes he was free to leave and return to his

cell, Simpson was not.  To the contrary, on April 27, 2000, he apparently was questioned while

in the infirmary, and while the record does not indicate the cause for his placement in the infirm-

ary, it would seem that Simpson may therefore have been unable to free himself from the questioning of the police.  For these reasons, when viewing the impact of Simpson's April statements in view of *Howe*, the Magistrate Judge concludes,  that the state court's decision denying relief constitutes an unreasonable application of federal law, as defined by the United States Supreme Court.  28 U.S.C. § 2254(d).

Moreover, and for the reasons addressed by the Court of Appeals, the error is harmless only as to Simpson's convictions on the general intent crimes of aggravated arson and five counts of felonious assault.

> This is so because Simpson's June 16th statement was properly introduced against him.  His admissions in that statement, standing alone, would be more than adequate to allow a reasonable juror to convict on the general intent crimes.  Simpson, therefore, is not entitled to relief as to those convictions.

*Simpson v. Jackson*, 615 F.3d at 445.  The same is not the case

> as to those convictions that required as an essential element a specific intent to cause the death of another—aggravated murder, murder, and attempted murder. This finding is reinforced when the error in admitting the April statements is combined with the error in admitting the June 20th statement. When viewed together, these statements show a person who initially denied any involvement but who then steadily admitted to more involvement with each subsequent interview. A juror faced with this progression of successive revelations of deeper involvement would not have very far to extrapolate from Simpson's June 20th admissions to the State's theory of purpose. Remove the April statements and the June 20th statement, however, and this juror would have to make a rather blind leap to infer the State's theory of purpose based solely on the June 16th statement.

*Id*. at 445.

For all of these reasons, the Magistrate Judge concludes that *Howes* does not alter the outcome of this case.

The Magistrate Judge **RECOMMENDS t**hat the petition for a writ of habeas corpus be **GRANTED** as to petitioner Simpson's convictions on aggravated murder, murder, and attempted murder, and that these convictions be **VACATED** subject to the State of Ohio commencing a re-trial on these charges within 90 days.  The Magistrate Judge further **RECOMMENDS** that petitioner Simpson's convictions on his remaining convictions be **DENIED** and that he be required to serve the remainder of his sentences on those charges.

### PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, *474 U.S. 140 United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decis-

ion, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.


                                       s/Mark R. Abel
                                       United States Magistrate Judge